**CROUCHET v. GEORGE H. LEIDENHEIMER BAKING CO., Limited, et al.**

No. 16922.

Court of Appeal of Louisiana. Orleans.

Nov. 14, 1938.

Edward Rightor and W. H. Sellers, both of New Orleans, for appellants.

Alexander E. Rainold, of New Orleans, for appellee.

WESTERFIELD, Judge.

Melvin Crouchet, an employee, brought this suit for compensation against his employer, the George H. Leidenheimer Baking Company, Ltd., and its insurance carrier, the Employers' Liability Assurance Corporation, Ltd., of London, England. The answer of the defendant was, in effect, a general denial.

There was judgment below in plaintiff's favor awarding him fifty-one weeks compensation at the rate of $13.65 per week, together with $50 as a fee for plaintiff's expert, Dr. W. E. Gardiner. Defendant has appealed.

Plaintiff had been for a period of seventeen years in the employ of the defendant bakery. At the time he claims to have been injured, April 6, 1937, he was working on what is called a "Thompson Machine", which shapes the dough into pieces fourteen inches long. It was the plaintiff's

duty to twist two of these pieces of dough together and place them in a baking pan.

Defendant denies that the plaintiff received any injury while in its employ and avers, in the alternative, that if he suffered any disability on April 6, 1937, it was due to the recurrence of an old injury "for which no responsibility would rest upon defendant".

Four witnesses testified on behalf of plaintiff, Bernard J. Schutten, Jr., and George Perrien, employees of the defendant baker, Dr. Fenner, who treated plaintiff, and Dr. Gardiner, who examined plaintiff upon request of his counsel.

Schutten stated that on April 6th, at the request of Mr. Perrien, he drove the plaintiff to his home, being informed that he "was injured or hurt".

Perrien, the foreman of the defendant bakery, testified that about 4:00 P. M. on that day, "I seen the boy lying on the step and I went and asked him—he called me and said, 'Cap, you have got to get a man in my place.' I said, 'All right.' He said, 'I can't go no more. I got it.' And I went out and called Mr. Schutten's son and told him, I said, 'Something happened to Melvin, I don't know what it is, and something—I got to get a man.' So the time we had come back, about 15 minutes later, Mr. Schutten's son had took him home, and I never seen him after that, never got any statement from him or anything."

Dr. Gardiner testified that he examined the plaintiff sometime during December, 1937, and that he "presented definite evidence on manipulation of both sacro-iliac joints, definite limitation of motion and pain on manipulation."

Dr. Fenner, who conducts an orthopedic clinic at Charity Hospital, testified that Crouchet was suffering from a "lumbosacrol and sacroiliac disturbance". He first treated him for a back injury in November, 1934, when he presented no symptoms of having a sacro-iliac strain, and again in May, 1937, when plaintiff had definite symptoms of a sacro-iliac strain. In the hospital records of the later date Dr. Fenner made the following notation.

"Comes in to see me today for first time since Nov. 1934. Says he has always had trouble with his back. But for past six weeks has been much worse. Thinks he twisted his back trying to catch his baby from a fall. He had definite bilateral sacro-iliac signs. Is wearing strapping, applied 2 weeks ago. I order R. I. & Sal. Rx."

Defendants make much of this statement of Dr. Fenner as indicating that the alleged sacro-iliac strain did not occur in the course of plaintiff's employment. Dr. Fenner, however, testified that though the statement was correct, "I recall quite distinctly that he told me that he hurt his back before that, and he was watching his baby and reached over it and strained it more severely, hurt it again. At that time I found he presented very definite symptoms of what we call sacro-iliac disturbance on both sides."

Crouchet explains the incident with reference to his baby as having occurred about two hours after he was taken home from the bakery.

Defendants produced two witnesses, Dr. E. A. Ficklen and J. K. Drury, their insurance adjuster.

Dr. Ficklen, upon the request of defendant, examined plaintiff in his office about December 13, 1937. He testified that on that date the plaintiff presented no evidence of sacro-iliac strain. Dr. Ficklen was informed that Drs. Gardiner and Fenner disagreed with him. Without criticizing either of these doctors he, nevertheless, maintained his position and adhered to his opinion to the effect that plaintiff was a malingerer.

J. K. Drury testified that he obtained a statement from Crouchet which he composed for him "in the usual manner of an insurance adjuster" by which he meant to say that though written by him it was read back to Crouchet before he was asked to sign it. In this statement Crouchet is quoted as saying: "When I injured my back on April 6, 1937, I don't know whether I had an accident which hurt my back on April 6, 1937, but it had been hurting me since I was injured in 1935 and I couldn't work after April 6th, 1937".

The records of the Charity Hospital show that plaintiff was first treated by that institution on May 10th, 1932, for a strained back and that he continued to receive treatments at intervals up to December 13, 1937, chiefly for his back, but sometimes for other ailments. On November 19, 1934, when he was first referred to Dr. Fenner, the following notation appears in the records: "I find no sacro-iliac signs. He is wearing a pelvic belt. I order salicylates." Plaintiff's back is not again referred to in the hospital record until April 14, 1937,

when the following notation appears: "Treated in Acc. Room 4–8–37. Sprain lower back, strapped. To return for observation."

▆ Defendant insists that upon this record there is no evidence of any accident having occurred in the course of plaintiff's employment and, in the sense in which the word "accident" is usually understood as involving violent contact with an inanimate object, no accident is shown to have happened. We believe, however, that the evidence sufficiently demonstrates that on April 6th, 1937, plaintiff sprained or strained his back while in the employ of the defendant bakery. It also appears that in the performance of his duties he was required to stoop over and it may have been that by reason of some sudden movement his back was injured or some previously existing weakness or malady in that region aggravated. Be that as it may, we are convinced that plaintiff was accidentally disabled in the course of his employment. He is, according to the testimony of two doctors, suffering from a sacro-iliac disturbance. It is true that Dr. Ficklen does not agree with these doctors, but without making any invidious distinction, we observe that the preponderance of the medical testimony is opposed to Dr. Ficklen's opinion. We believe that the plaintiff should recover.

▆ We find in the record an intervention on behalf of the Charity Hospital claiming $84 as the cost of hospitalization. The judgment is silent with respect to this intervention so we take it that it was dismissed and since no appeal has been taken on behalf of the hospital, the claim must be considered as having been abandoned.

▆ Defendant objects to the amount of the fee awarded Dr. Gardiner in the judgment, citing Bell v. Employers' Liability Assurance Corp., Ltd. La.App., 152 So. So. 766. In the cited case we reduced the fee of medical experts from $25 to $15, but in that case "there was little controversy over the physical condition of the plaintiff and * * * the experts are agreed as to his condition and submitted their agreement in writing" [page 770]. Dr. Gardiner was allowed $50. We believe this should be reduced to $25.

For the reasons assigned the judgment appealed from is amended by reducing the amount allowed Dr. Gardiner as an expert fee to $25. In all other respects the judgment appealed from is affirmed.

Affirmed.